The next case, number 181258, United States v. René Garay-Rodriguez. Good morning. Good morning. If you may please the court, I am Julie Sutherland. I am the attorney for appellant René Garay-Rodriguez. Thank you. I would like to reserve two minutes for rebuttal if I am allowed, please. Yes, you are. Thank you so much. Your Honors, this case brings forth the use of the Sherman Antitrust Act to convict of, in this case, a bid rigging, a purely local municipal activity of drivers who would transport children to school. In terms of the jurisdictional elements that would bring this activity, this particular activity under the aegis of the Sherman Act, the government proposed the use of buses, the use of gasoline, and in the reply brief, they also proposed that the municipality of Caguas would be deprived of using those monies they had in other purchases. Now, we have strongly argued and developed in our brief and our reply brief the fact that we believe it is not sufficient because the gasoline and the buses, the gasoline is an ongoing purchase that we could do every day as need be basis. But, for example, the buses that were proposed at trial as basis for jurisdiction that it affects interstate commerce because they were purchased in Florida, they were not purchased during the relevant times. They were a one-time purchase way in the past. And the gasoline, well, the buses can't run without gasoline. But other than that, the main factor brought forth as a jurisdictional strong tie was the fact that the U.S. Department, yes? So why is it, I mean, the test is not in substantial effect on commerce. That is correct. And so the fact that the buses were purchased outside of the bid rating scheme, why is it enough to say that the stifling of competition impacted commerce because other people were not buying buses? Well, there was nothing in the record to argue in the negative that the fact that these people were having the contracts and getting the monies paid would impact that market. The fact is that the only evidence was that they had purchased them way before, years before, Your Honor, outside of the scope of the allegations of the conspiracy. And particularly, they never did say whether they were purchased with monies gained by any illicit means. I mean, if I could say, bring forth a comparison. I mean, I buy a car in Puerto Rico, and I bought it 10 years ago. It's paid for its use. I buy gasoline, and I'm accused of federal offense. And somebody can say, well, she's using a car that was brought in interstate commerce because there's no manufacturing of cars in Puerto Rico, and she's using gasoline, so that makes it federal. Is that sufficient to bring this activity, which is, again, a local activity? But we're talking about affecting interstate commerce, which is a little broader than just interstate commerce. That is correct. But then again, the test is not insubstantial, not insubstantial, not a de minimis touch upon. I made a distinction in my reply brief about the Hobbs Act and probably the felon in possession jurisdiction, because those are activities, for example, I mean, that's robbery, and that's a weapon. But this is a bus that was purchased way before, and this individual has been providing bus services, prior to the time of the allegations in this particular indictment. So therefore, isn't it relevant that the buses were purchased way before and not during the time? Well, if you purchase a gun a year or two before a robbery in interstate commerce and then use the gun for the robbery, don't you have a sufficient effect? No, well, that is true. But again, those types of acts, for example, it has to do with a robbery and a gun, the nature of the offense. And so here the heist is not with a gun on a bank. The heist is with buses on a school by fixing the price that you'll charge use of the buses to the school system. That's exactly what the jury had to decide in this case, Your Honor. And that brings me to another, if I may move on, another issue. It was bid rigging. Excuse me? Bid rigging. That is correct. The allegation is bid rigging. What's the difference between bid rigging? Bid rigging is just a form of price fixing. The horizontal agreement as to what prices will be charged and who will bid what prices. You know, that is correct, Your Honor. Prices have to be established when you go for bid rigging. But it's market allocation that makes the difference. The finding that has to be made in this case was market allocation. And it had to do with bids, bid rigging, which brings us again, Mr. Garay, to our next big point. In this particular case, there is a breaking of the nexus between the auction and the actual contracts that were awarded, Your Honors. There is the one letter that was mailed with the U.S. Postal Service. That is actually what brings into the mail fraud allegations. What that said was that letter mailed in, I think it was December of 2013, December, that there was no awarding under the bids. No awards were given because the prices were too high. And the municipality called every one of those bus service providers, one by one, Your Honors. And they met with them, and they renegotiated and discussed new terms. Now, isn't that a breaking of the nexus of the bid? There was no bid. Well, go ahead. Yes. Why didn't those illegal bids serve as the baseline for the negotiations? Well, Your Honor, the fact of the matter is, again, they called the people that were bidding because this is, again, a local provider. This was strictly within the town's country roads of Caguas, Puerto Rico. They were the same group of people, Your Honor. If the negotiations would have started like this, you were the winning bidder, and the bid you submitted is unacceptable because it's too high. It would have brought in the price that was the result of the bid rigging into these negotiations for the price that was actually set. Well, actually, Your Honor, if I address that in the reply brief, I understand that the certified translation of the letters did not actually say that. They say, we are not awarding any of the contracts because the bids were too high. So the starting point was not the bids. They basically vacated. That's a word I keep using in our submissions. They vacated the bid because they were too high, and they sat one by one individually. That's a much better way to negotiate a price if you're a seller is to sit one by one and have an open market where you know you have competition. When you sit down, you know, I've already got agreement from my competitors that they're not going to butt in here so I can hang tough on a higher price. That's the whole reason you do bid rigging. Well, the intervening months that happened between the submission of the bids, the mailing of that letter saying that there was no awards under the bids, and the meetings and the final, again, contractual letters, belie the fact that there was time in between. There's no allegations there was any collusion. These people had been providing services. Mr. Garay has a history of having provided services. That's all he did, drive buses. So, therefore, it is, again, you say it was convenient to meet and negotiate, but the contrary is true in this case. They said they were too high. So they started, give me lower. So there's no indication and no evidence whatsoever that they colluded after those letters, Your Honors. My time is up. If you don't have any more questions, I will, again, refer you to the briefs. We submitted, and then I'll have time to rebut if anything. Thank you. Thank you. Mr. Benz, good morning. Good morning. I would like to ask you a question because I have read somewhere that goods in interstate commerce come to rest. They do not provide jurisdiction under the interstate commerce clause. That issue was never raised in this case, Your Honor. Well, the issue of interstate commerce was raised, so I'm raising it now. Yes. As to particular cases. Are there such cases? I'm not sure. I believe there may be, but in a different context. I think on the issue of the buses, if this is relevant to what my opponent raised, the question of the buses being purchased in the past, the effects test as laid out by the Supreme Court in its summit health decision is future looking, not past looking. The issue is would there have been a not insubstantial effect had the conspiracy succeeded? So I don't think it's relevant that the buses were purchased in the past or outside the period of the indictment. The relevant fact is that the buses were used, were traveled in interstate commerce and were used to perform the services that were the subject of the bid rigging and auction manipulation. That was the point that I wanted to make on the buses. If I may turn to the nexus argument or the connection between the negotiation process and the auction process, it is not correct to say that the renegotiation was some separate process disconnected from the auction. There was abundant evidence in the record from which the jury could conclude that they were part and parcel of the same process. Judge Thompson, you put your finger right on one of those facts, which is that the auction process determined who were the low bidders that CAGWAS then negotiated with. The testimony from the CAGWAS official, Ortiz Pena, was that CAGWAS only negotiated with the low bidders, and it was the auction that determined who were the low bidders and what their bid prices were to be negotiated, I mean to be negotiated down. CAGWAS official Ortiz Pena also testified that all services for more than $100,000 had to be awarded by auction. That's at docket 215 at page 20. So the defendants could not have received contracts from the negotiations alone. They could only receive contracts as a result of an auction, as an auction process. And the defendants knew this. At supplemental appendix page 30, this is the transcript of the La Barra meeting that was taped by the cooperating witness, Aldea Rodriguez, the defendant, Vega Martinez, told the other meeting participants that CAGWAS might later call for a renegotiation, and so they should take account of that fact and build it into their bid prices, implicitly saying, you know, bid higher because the CAGWAS may eventually try to bargain you down. So the defendants knew that negotiation might be a part of the auction process. In addition, I'd like to point out that as a matter of law, under Section 1 of the Sherman Act, just as in many other types of conspiracies, the agreement is the crime. It doesn't matter whether the agreement was partially carried out, fully carried out, or not carried out at all later. No, but that would affect your restitution award if they were right on this and if all you were left with was the agreement. It might. It might. Could you go back to the jurisdictional issue? One of the grounds you mentioned was that federal funds purchased these services through the town. Yes. Do you have any case authority? What's your best case that says that we can rely on federal funds for a commerce nexus? Goldfarb, as we cited in our brief. We think this case is analogous to Goldfarb, in which the Supreme Court was, and by the way, we use the word jurisdiction, but the issue here is not subject matter jurisdiction. It's interstate commerce as an element of the offense. In Goldfarb, the court was satisfied that federal monies, money coming from out of state and federal loan guarantees from the District of Columbia federal agencies, they were VA and FHA loan guarantees, were sufficient because they supported the underlying real estate transactions. Here we have federal monies supporting the actual bid rigged, not an underlying transaction, but the actual conduct that was rigged. We have federal monies supporting it. So we think actually our case is stronger factually than Goldfarb. But on this issue of the renegotiation and the auction process, because under the Sherman Act the agreement is the crime, the agreement was made at the LaBarra Community Center meeting, and so the offense took place at that time. It really doesn't legally matter what happened after that point. The defendants had violated Section 1 of the Sherman Act, and the district judge instructed the jury on this very point twice, in fact. That's at docket 235 at pages 169 and 177. So I don't think there's any merit to this notion that the renegotiation process was some separate process. If you look at the award letters that the defendants actually received from COGWES, for example, supplemental appendix page 409, that's the defendant Gary Rodriguez's award letter. The award letters state right at the top, this is for auction 2014-49, the October 2013 auction. They don't say you've been awarded a contract as a result of some separate negotiation process unrelated to the auction. They actually say you're getting this as a result of the auction. So unless there are further questions from the court, I think we'll rest on our brief, and the conviction and the restitution order should be affirmed. Thank you. A brief point, Your Honors. Goldfarb. The real estate transactions needed the loan guarantees, and they were federal funds. Here, there is an allotment or money passing from the Federal Department of Education to the Puerto Rico Department of Education to the municipality of COGWES to the payment of the buses. Now, the proportion is irrelevant, I guess, at this point, because the result of Goldfarb, if applied to this case, would be that any federal dollar, if it has an original, I'm sorry, origination in any federal agency that somehow gets to another dependency of a local government, will make every activity federal, Your Honor. And this is what we see as not exactly what Goldfarb stands for. Well, it just means there's an effect if you bid rig and raise the prices for services that are paid for, in large part, by the U.S. government. All proposition the other side is making is that that could have some effect on commerce. Yes, Your Honor. It could have an effect, just like, again, if I buy a used car, I have to use gasoline. In Puerto Rico, everything would be interstate commerce. Actually, Goldfarb refers to real estate transactions and lawyer fees and that kind of thing. In our brief, we mentioned cases directly handling transportation issues, road issues, and they have found there's no federal jurisdiction, even though there is activity around transportation, buses, and construction of roads. And it's just a case from Georgia, and, again, I refer to my brief, Your Honors, and I have 18 seconds. But definitely, we're removed. This is a mountain town. There's nothing touching this town except the toxic federal dollar and maybe the gasoline and that old bus. That's what the government relies to just use Sherman jurisdiction to attack this transaction. Thank you. Thank you.